UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | | |
|---|---|---|
| JOHN PUKIS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil No. 2:12-CV-447-JD-APR |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION & ORDER

On September 11, 2009, Claimant John Pukis applied for Social Security Disability

Insurance Benefits ("DIB") and Supplemental Security Income Benefits ("SSI") with an alleged

disability onset date of January 5, 2009.[1] [Administrative Record, hereafter "AR", 232-41].

Pukis's application was denied and he requested a hearing before an Administrative Law Judge

("ALJ"). [AR 157]. The hearing was held on April 1, 2011, before ALJ Curt Marceille in Gary,

Indiana. [AR 76-119]. Pukis and a Vocational Expert ("VE") testified, with Pukis's attorney in

attendance. *Id.* On May 6, 2011, the ALJ issued a decision finding Pukis not disabled under the

Social Security Act [AR 57-69], concluding that he had the residual functional capacity

("RFC")[2] to perform jobs that existed in significant numbers in the national economy. [AR 68-

69]. On August 27, 2012, the Appeals Council denied Pukis's request for a review of the ALJ's

---

[1]The regulations governing the determination of disability for DIB are found at 20 C.F.R. §
401.1501 *et. seq.*, while the SSI regulations are set forth at 20 C.F.R. § 416.901 *et. seq.* Because
the definition of disability and the applicable five-step process of evaluation are identical for
both DIB and SSI in all respects relevant to this case, reference will only be made to the
regulations applicable to DIB for clarity.

[2]Residual Functional Capacity is defined as the most a person can do despite any physical and
mental limitations that may affect what can be done in a work setting. 20 C.F.R. §
404.1545(a)(1).

decision, at which point the ALJ's decision became the final decision of the Commissioner. [AR 1-3].

On October 31, 2012, Pukis filed his complaint in this Court pursuant to 42 U.S.C. § 405(g), alleging that the ALJ's decision was in error. [DE 1]. On March 26, 2013, the Commissioner filed an answer to Pukis's complaint. [DE 12]. On June 6, 2013, Pukis filed his opening brief [DE 16], on September 11, 2013, the Commissioner filed a response [DE 22], and on September 30, 2013, Pukis filed his reply. [DE 24]. For the reasons that follow, the Court finds a remand is necessary because the ALJ's findings relative to medical equivalence and Pukis's RFC were not sufficiently substantiated with evidence in the record.

## I.    BACKGROUND

John Pukis was born on July 11, 1961. [AR 232]. Pukis was 49 years old at the time of the ALJ's opinion, and he suffers from neck pain [AR 84-85], chronic back pain from osteoarthritis, chronic obstructive pulmonary disease ("COPD") [AR 578], difficulties with standing and sitting for a long period [AR 83-84], depression and suicidal thoughts [AR 96-97], pain in the right shoulder from a previous surgery, and pain in the right knee and left ankle from previous injuries. [AR 103]. He has reportedly attempted to commit suicide 10-12 times since 1985. [AR 94]. Pukis has more recently been diagnosed with alcohol and opiate dependence [AR 1971-72; 1193-96], and he was previously addicted to heroin "on and off" after his military discharge in 1984 until 2006. [AR 95].

Pukis received a GED in 1980. [AR 306]. He served in the United States Military from November 3, 1980 to February 13, 1984. [AR 232]. In the 15 years prior to his disability application, Pukis worked as a laborer, steel worker, and as an ultrasound operator. [AR 114, 308]. Even after having surgery in 1995 for biceps tenodesis of the right shoulder [AR 460, 715,

969, 978], he was able to work from 1995 through 2005 in iron manufacturing. [AR 602]. Pukis

stopped working on January 5, 2009 [AR 308], when he was terminated due to missing work

while incarcerated, and his records reflect he had violated his probation due to substance abuse.

[AR 81-82]. After termination he actively searched for employment but could not find work

which he could physically perform. [AR 83-84]. He remained insured for the purposes of DIB

until March 31, 2013. [AR 57].

A.    **Medical Health History**

On January 22, 2006, Pukis was admitted into the ER subsequent to becoming

unconscious after a heroin overdose and it was noted he had depressive thoughts. [AR 599-603].

Upon admission, Pukis had a Global Assessment of Functioning ("GAF") of 30[3] [AR 500], and

he stated that he "almost died, overdosed on heroin." [AR 601].  Pukis's past psychiatric history

indicated that he was a substance abuser, but indicated he had gone weeks without a drink prior

to his admittance. [AR 602]. On January 24, 2006, Pukis requested to be discharged, stated that

his withdrawals had passed, and that upon admission he actually did not intend to kill himself,

but rather felt as if he would die if he continued his life style. [AR 603]. Upon discharge, his

---

[3]A GAF score measures a clinician's judgment of the individual's overall level of psychological, social, and occupational functioning. *See* DIAGNOSTIC & STATISTICAL MANUAL OF MENTAL DISORDERS-Text Revision 32 (4th ed. 2000).  The higher the GAF score, the better the individual's level of functioning. While GAF scores have recently been replaced by the World Health Organization Disability Assessment Schedule, at the time relevant to Pukis's appeal, GAF scores were in use.  *See* Wikipedia, Global Assessment of Functioning, http://en.wikipedia.org/wiki/Global_Assessment_of_Functioning (last visited Jan. 16, 2014).  A GAF score of 21-30 indicates behavior is considerably influenced by delusions or hallucinations or serious impairment in communication or judgment, or inability to function in almost all areas.

health summary indicated he had substance induced mood disorder, alcohol dependence, heroin dependence, a history of marijuana use, and a GAF score of 40.[4] [AR 600].

General medical evaluations in March of 2006 revealed that Pukis was suffering from depression and right elbow pain. [AR 994-998]. Over a year later, in September through October of 2007, Pukis visited Dr. Ham at Bone & Joint Specialists, P.C., who determined that Pukis suffered from a stiff right elbow on account of arthritis and cubital tunnel syndrome, and it was suggested that Pukis undergo surgery by having a contracture release performed. [AR 463-64]. After having the surgery in late October 2007, Pukis began receiving therapy. On January 16, 2008, Pukis attended a follow-up visit wherein he reported no complaints and planned to return to work as a welder on January 28. [AR 457]. Dr. Ham determined that Pukis was doing well and would in fact be released to work, without restriction, by January 28, 2008. [AR 457; AR 481].

However, on August 25, a follow-up study of Pukis's right elbow indicated he had arthritis of the elbow and two small metallic tuck points at the level of the medical humeral epicondyle. [AR 647-48]. On October 1, 2008, an X-ray of Pukis's right elbow displayed diffuse significant osteoarthritis with small suture anchors on the medial distal humerus. [AR 970].

In April 2008, Pukis went to St. Catherine Hospital due to chest pain that he began feeling while at work, and he was discharged later that day with a diagnosis of chest pain, anxiety, and hypertension. [AR 1774, 1778-81]. On August 15, 2008, an Emergency Department record indicated that Pukis was feeling depressed, empty, and lost. [AR 993]. Pukis claimed during his visit that he had been laid off work for the past 2 months at that point. *Id*. He

---

[4]A GAF score of 31-40 indicates some impairment in reality testing or communication, or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood.

denied having suicidal ideation ("SI"), but noted that his mother passed away in February of that year. [AR 985]. His mental evaluation indicated a history of heroin abuse and years of depression which was becoming progressively worse. *Id.* The evaluation noted that Pukis had developed a phobia of crowds during the last 5-6 years, that he had panic attacks on occasion, and that he had difficulty falling asleep, which he attributed in part to his elbow pain. *Id.*

A psychiatry attending note from September 17, 2008 indicated that there was also some concern that Pukis was having seizures, which required further evaluation. [AR 975-78]. Pukis continued to experience stress from his chronic pain in his right shoulder, elbow, and wrist, as well as hypertension, COPD, Hepatitis C, and a history of two head injuries. [AR 978-80]. He was diagnosed with opiate dependency, polysubstance abuse, chronic pain, depressive and anxiety symptoms, and possible seizures. [AR 980]. Pukis received a GAF score of 50.[5] *Id.*

In August 2008, an x-ray imaging of Pukis's right elbow revealed a low narrowing and arthritis, along with the presence of two small metallic tuck points at the level of the medial humeral epicondyle. [AR 648]. On October 1, 2008, an orthopedic surgery consultant determined that Pukis had significant right elbow pain and stiffness following prolonged immobilization of his right upper extremity and noted that Pukis was taking a variety of narcotics for this pain. [AR 969-970].

A neurology report taken the next day indicated that Pukis's left temporal region displayed a mild to moderate slow wave abnormality, indicating a neurological disturbance. [AR 969]. And a psychiatric progress note completed two weeks later by Dr. Constance Phillips indicated that Pukis was no longer being prescribed vicodin for his chronic arm pain, and that he wanted to be placed on methadone treatment for his withdrawal symptoms [AR 966]. He

---

[5] A GAF score of 41-50 indicates serious symptoms or any serious impairment in social, occupational, or school functioning.

claimed to still be in pain and also denied any heroin use since the summer of 2008. *Id*. Pukis received a GAF score of 45 that session. [AR 968]. A follow up progress report by Dr. Phillips on November 13, 2008 noted that Pukis was experiencing myoclonic jerks in the middle of the night, but no other seizure-like activity. [AR 962]. The doctor's diagnostic impressions included depressive disorder not otherwise specified ("NOS"), anxiety NOS, opiate dependency, history of polysubstance abuse, chronic pain in the right arm, and seizure disorder. [AR 963]. Pukis received a GAF score of 50. *Id*.

Pukis was next seen at the hospital in January of 2009 due to intolerable left shoulder pain that he had been having for one and a half weeks, which was diagnosed as musculoskeletal arm pain. [AR 1791-94]. Pukis denied any known injury and was able to move the arm independently to change into his hospital gown. [AR 1794]. He was discharged the following day in stable condition. [AR 1796].

Then on February 2, 2009, Dr. Phillips created a suicide risk assessment note, where she indicated that Pukis's risk level was low and that he was doing better, sleeping 8-10 hours a night, and staying clean from opiates and alcohol. [AR 710-711]. The doctor's diagnostic impressions included depressive disorder NOS, anxiety NOS (consider panic disorder with agoraphobia), opiate dependency in recovery, history of polysubstance abuse, chronic pain in the right arm, and history of a seizure disorder. [AR 712]. Pukis received a GAF score of 50. [AR 961].

However, later that month, Pukis was hospitalized for three days after having become increasingly suicidal and drinking to "quiet the thoughts in his head." [AR 578-79]. Upon admission, he indicated he was ready to overdose with ten bags of heroin. [AR 581]. He reported having lost his job and having been a heroin addict for 23-24 years. [AR 581]. He also admitted

to recently using heroin on a daily basis, drinking two to three fifths of liquor daily, and using methadone, benzodiazepines, and narcotic analgesics "off the street." [AR 579]. He claimed to have taken his medications regularly with little benefit. [AR 703]. Pukis's drug screen indicated a positive result for benzodiazepine. [AR 579, 1819]. Pukis received therapy and stated he wanted to work on maintaining sobriety and obtaining unemployment insurance. *Id*. Upon admission his GAF score was 38, and upon his February 27 discharge, his GAF score was 51. He was diagnosed with opiate dependence, alcoholic dependence, depressive disorder, COPD, chronic pain, osteoarthritis, abnormal EEG, and Hepatitis C. [AR 578].

A mental health progress note from March 2, 2009, created by Dr. Phillips, reported that Pukis was feeling 100% better since his previous hospital admission. [AR 635]. He denied having any SI and claimed he was fully compliant with the citalopram (used to manage depression). *Id*. However, a follow-up report a week later indicated that Pukis was only getting 3-4 hours of sleep a night (which continued throughout the month) and that he was drinking multiple beers daily, but he denied using opiates or cocaine. [AR 631-33]. When social workers attempted to contact Pukis the following month, they could not reach him and instead reached his girlfriend who noted that he was doing "excellent." [AR 628]. By mid April 2009, Dr. Phillips noted Pukis had not been following through with appointments and she was concerned about his desire to commit to less structured/intensive services. [AR 627]. When Dr. Phillips finally reached Pukis in late April 2009, he claimed to be doing well mood-wise, and indicated that he remained clean from illegal drugs, but had been drinking 1-2 beers per day. [AR 625]. Pukis was not sure whether the gabapentin was doing much for his anxiety, and he reported that he was taking a lot of ibuprofen for his chronic pain. *Id*.

When Pukis actually met with Dr. Phillips in late April 2009, Dr. Phillips determined that Pukis suffered from recurrent depressive disorder, anxiety disorder, polysubstance dependence, and assigned him a GAF score of 45. [AR 620-623]. On June 9, 2009, Pukis met with Dr. Phillips again, and claimed that he was clean and sober, denied having any side effects with his current medications, and stated that he was only sleeping 4-6 hours per night. [AR 617]. Dr. Phillips referred Pukis for individual psychotherapy to reduce his anxiety. [AR 618].

On July 11, 2009, Pukis was admitted to the St. Mary Medical Center Emergency Department after hitting a wall while operating a motorcycle inebriated. [AR 532-35]. Pukis had an ankle sprain, multiple external abrasions, and road rash on his left arm and the left side of his chest. [AR 534-35]. CT scans performed of his skull proved negative, but left ankle scans revealed an old injury. It was also determined that he had mild arthritic changes in his spine at C7. [AR 546-52]. Pukis's drug screen was negative for amphetamine and barbiturates, but positive for benzodiazepines. [AR 553]. He was discharged the same day. [AR 530].

On August 24, 2009, a psychology progress note conducted after Pukis met with psychiatric coordinator Dr. Ronald Ballenger, indicated that he was feeling suicidal the past few weeks, but not that particular day. [AR 612-13]. Pukis admitted he missed his last session due to being drunk. [AR 613]. Pukis noted that he had felt suicidal and depressed over the past several years. [AR 613]. He was assigned a GAF score of 45 and he reported a pain level of 4 in his left elbow. [AR 614]. Pukis also met with Dr. Phillips that day and admitted that he had already drank beer that day, that he had been buying alprazolam on the street, and that while he remained clean from narcotics and cocaine, he felt like "he has been losing it again." [AR 615].

A general medical note from early September 2009 indicates that Pukis was being reevaluated for smoking and treated for alcohol use. [AR 609]. At the time of the visit, his

documented body mass index was 28.5. *Id*. During his visit, Pukis admitted that his drinking made it somewhat difficult for him to do normal activities, such as work, take care of things at home, and get along with others. [AR 610]. Pukis denied having thoughts about suicide. *Id*. It was noted that he demonstrated a positive screen for PTSD. *Id*. Later that month, Pukis spoke with Dr. Phillips, during which Pukis expressed concerns about his anxiety and fleeting SI with no plans or intent. [AR 609]. He stated that he was still drinking and denied relapsing with opiates or cocaine. *Id*.

Licensed clinical psychologist Patrick McKian, Ph. D., performed a mental status examination of Pukis on October 7, 2009. [AR 715]. Pukis indicated he was claiming disability because of his loss of mobility of his right arm and shoulder after having surgery in 1996 and elbow and wrist surgery in October 2008. *Id*. Pukis noted that his medical symptoms included shortness of breath much of the time, chronic pain in the right arm, and tingling and numbness of the fingers in his right hand. [AR 716]. Pukis also reported that he was suffering from COPD, Hepatitis C, depression and anxiety, and substance abuse problems [AR 715], but he was able to take care of his own personal hygiene. While he had no hobbies, he used to be good at chess but began having a difficult time concentrating. [AR 717]. McKian determined that Pukis suffered from recurrent major depression, as evidence by his multiple hospitalizations, depressed mood, social withdrawal, apathy, loss of interest in most activities, loss of appetite, and sleep disturbance. [AR 718]. McKian concluded that Pukis often used drugs and alcohol as a way to self medicate prior to receiving treatment, which was probably exacerbating his depression. *Id*. McKian also opined that Pukis had chronic pain in his right shoulder, elbow, and wrist, shortness of breath, possible seizure disorder, and Hepatitis C. McKian assigned Pukis a GAF score of 60.

On October 19, 2009, Pukis was admitted into the in-patient psychiatric floor in Dyer for three days after he had taken a razor blade and cut his left wrist in the presence of the police. [AR 605-08, 722, 1967]. His blood alcohol level was high upon admission. [AR722]. Pukis claimed that he had cut himself to relieve himself of the guilt from trying to hurt his girlfriend recently, and not because of suicidal thoughts. [AR 605, 877]. He reported that he was experiencing pain in his right shoulder. *Id*. He acknowledged that he had stopped taking both the citalopram and the gabapentin medications due to feeling itchy. [AR 607]. Pukis stated that he has continued to drink about 2-3 beers daily. *Id*. He denied any relapse with heroin or cocaine and any cravings for drugs. *Id*. While in in-patient care, Pukis stated that his sleep fluctuated and he had poor concentration. [AR 1967]. He denied any SI, but admitted that he had attempted suicide 2-3 times in the past after overdosing on heroin. *Id*. He was discharged on October 22, 2009, with a GAF score of 35-40, and his discharge diagnoses included alcoholic dependence, history of opiate and cocaine abuse, depression, anxiety (rule out substance induced mood disorder with anxiety and generalized anxiety disorder). [AR 724]. A week later, Pukis met with Dr. Phillips and claimed that he was feeling alright, but that he was having bad nightmares and panic attacks. [AR 875].

The next month, Pukis was evaluated by psychologist Ronald Ballenger, who indicated that Pukis had dysthymic disorder, opiate dependency in early recovery, polysubstance abuse, and a GAF score of 45. [AR 747-48]. During the evaluation, Dr. Ballenger reviewed Pukis's cutting behavior, and Pukis expressed that he did not know what he was thinking when he cut himself. [AR 748]. He exclaimed that he no longer had a desire to kill himself. *Id*.

On November 11, 2009, Pukis was examined by Dr. Smejkal who indicated that Pukis presented with complaints of right arm and elbow pain/stiffness, depression, suicidal thoughts,

COPD, Hepatitis C, and shortness of breath. [AR 752-56]. Dr. Smejkal indicated that although Pukis had pain and stiffness in his right arm and elbow, he did not have a decreased range of motion and retained full strength with normal grip strength and good fine finger manipulative abilities. *Id.* His impression was that Pukis suffered from a history of osteoarthritis in his right elbow and arm, Hepatitis C, depression, and suicidal tendencies, and that he also suffered from COPD and had previously had bones spurs removed from his right elbow. *Id.*

On November 16, 2009, a CT head scan was conducted due to an abnormal EEG, and the report indicated that Pukis shakes in his sleep. [AR 806]. The findings were consistent with mild cerebral and cerebellar atrophy and pansinusitis. [AR 807].

On November 17, 2009, a psychology progress note indicated that Pukis had dysthymic disorder, opiate dependency in early recovery, and polysubstance abuse, and he was drinking beer and hard liquor a few times a week. [AR 870-73]. Pukis received a GAF score of 45 that day. [AR 874]. A neurology note created two days later reported that Pukis had black out periods involving moments of waking up and not knowing what happened, and that he suffered from jerking "fits" in his sleep. [AR 867]. A November 23, 2009, medical progress note indicated that Pukis had sinusitis. [AR 866].

A psychiatric review technique and mental RFC assessment performed by Donna Unversaw, Ph.D., on December 1, 2009, indicated that Pukis suffered from recurrent major depression and generalized anxiety disorder, and he was polysubstance dependent (alcohol, heroin, and benzodiazepine). [AR 771-88]. Dr. Unversaw found that Pukis had mild limitations with restrictions in activities of daily living, moderate difficulties with maintaining social functioning and maintaining concentration, persistence, or pace, and no episodes of decompensation (each of an extended duration) or evidence of "C" criteria". Dr. Unversaw

determined Pukis was not significantly limited in his abilities to remember locations and work-like procedures; to understand, remember, and carry out very short and simple instructions; to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; to sustain an ordinary routine without special supervision; to work in coordination with or proximity to others without being distracted by them; to make simple work-related decisions; to interact appropriately with the general public; to ask simple questions or request assistance; to accept instructions and respond appropriately to criticism from supervisors; to maintain a socially appropriate behavior; to adhere to basic standards of neatness and cleanliness; to respond appropriately to changes in the work setting; to be aware of normal hazards and take precautions; to travel in unfamiliar places or use public transportation; and, to set realistic goals and make plans independently of others. [AR 785-86]. Dr. Unversaw also opined that Pukis was moderately limited in his abilities to understand, remember, and carry out detailed instructions; to maintain attention and concentration for extended periods; to complete a normal workday and workweek without interruptions from psychologically based symptoms; to perform at a consistent pace without an unreasonable number and length of rest periods; and, to get along with coworkers or peers without distracting them or exhibiting behavioral extremes. *Id*. Dr. Unversaw believed Pukis underreported the extent and frequency of his drug use, and that during periods of sustained sobriety, Pukis's condition significantly improved and his underlying depression and anxiety were fairly well controlled. [AR 787]. Thus, Dr. Unversaw believed that with sustained sobriety, Pukis would be able to perform routine, repetitive tasks as he had done in the past. [AR. 788]. Joelle J. Larsen, Ph.D. reviewed Pukis's file on March 17, 2010 and affirmed the psychiatric assessment performed by Donna Unversaw. [AR 1177].

On December 10, 2009, Dr. Ballenger conducted a psychology progress note indicating Pukis had reported that his arm continued to hurt severely, especially at night, that Pukis was working on challenging Sudoku puzzles, and that Pukis enjoyed playing chess but his skills had diminished over the past ten years. [AR 862]. Pukis received a diagnosis of dysthymic disorder and was assigned a GAF score of 45. [AR 863-64].

Medical consultant Dr. K. Siddiqui performed a physical RFC assessment of Pukis on December 29, 2009. [AR 789-96]. He determined Pukis was able to occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, stand/walk about 6 hours in an 8 hour workday, sit about 6 hours in an 8 hour work day, and his ability to push and pull was unlimited. [AR 790]. Dr. Siddiqui noted that although Pukis had right elbow cutibal and carpal tunnel syndrome, along with pain in his right elbow, he had a normal range of motion and full strength in his extremities. In addition, Dr. Siddiqui noted that although Pukis had an abnormal EEG and possible seizure disorder, he was not taking any medication. *Id.* Regarding postural limitations, he determined Pukis was able to frequently balance, stoop, kneel, crouch, and crawl, occasionally climb ramps and stairs, but never climb ladders, ropes, or scaffolds. [AR 791]. He concluded that Pukis had no upper extremity manipulative limitations or visual limitations, and no communicative or environmental limitations, except that Pukis needed to avoid concentrated exposure to hazards, such as machinery and heights. [AR 792-93]. Dr. Siddiqui determined that Pukis's allegations regarding his symptoms appeared only partially credible. [AR 794]. Doctor J. Sands reviewed Pukis's file on March 30, 2010 and affirmed the assessment performed by Dr. K Siddiqui. [AR 1178].

On February 10, 2010, Pukis's right shoulder was examined due to pain, and the X-ray displayed the presence of two metallic tuck points overlying the proximal humerus. [AR 803].

Pukis stated that he had no strength in his shoulders and arms, and that the pain in his elbow was like being hit with a hammer. [AR 850]. In addition, a radiology report indicated evidence of osteoarthritis in his right elbow, with soft tissue calcifications at the anterior aspect of the elbow, and tuck points at the level of the medal humeral epicondyle. [AR 805]. A radiology report of his cervical spine revealed osteoarthritis of the lower cervical spine and a narrowing of the cervical disc spaces at C3-C4 and C5-6 and C6-7 [AR 805], which was also seen on Pukis's May 19, 2010 imaging. [AR 1180-84]. The May 19 CT imaging of the cervical spine additionally showed spinal stenosis in the lower cervical spine, most severe at the C6-7 level; retrolisthessis at C6-7; subacute fracture of the C6 with partial impaction of the fracture fragment into the vertebral body, spinal canal, and the C6-7 nueroforamina; small disc bulges at C3-4, C5-6 and C6-7, with the latter two abutting the cord; osteoarthritis of the lower cervical spine; and narrowing of the C5-6 neural foremen. [AR 1180-84]. An EMG conducted on May 20, 2010 showed chronic, left C5-6 radiculopathy. [AR 1420].

On February 10, 2010, Dr. Phillips created a psychiatry attending note, where she indicated that Pukis remained clean from heroin and opiates for the past year and a half, that he was still drinking alcohol because according to Pukis it was the only thing that soothed his sore throat, and he was still buying valium off the streets and having recurrent nightmares and flashbacks. [AR 858]. It was recommended that he continue psychotherapy with Dr. Ballenger and he received a GAF score of 50 that day. [AR 860]. His prognosis was deemed fair to poor due to his continued drinking. *Id*.

On February 24, a neurology follow-up note indicated Pukis was experiencing black out episodes every week or so and night time jerking of his upper extremities. [AR 846]. During the blackouts, Pukis indicated he did not remember events and at one point he had even hit his

girlfriend and ended up in jail. [AR 847]. Pukis could not remember if he was intoxicated during the event. *Id*.

On March 2, 2010, Pukis underwent a radiology exam of his neck due to hoarseness and symptoms of choking, gagging, and having a scratchy throat. [AR 799, 804]. The impression from the neck CT with contrast indicated left maxillary and ethmoidal sinus disease and mild degenerative changes in the cervical spine. [AR 800].

On March 10, 2010, psychologist Ronald Ballenger completed a progress report of Pukis, which indicated that Pukis reported sleeping fairly well, feeling calmer, and staying sober with the medications that Dr. Phillips prescribed. [AR 839]. His shoulders hurt him constantly with sharp intense pain, but he was still able to ride his bicycle and get some exercise. [AR 839-41]. He was diagnosed with PTSD, major recurrent depression in partial remission, alcohol and benzodiazepine abuse, tobacco use, opiate dependence and polysubstance abuse in recovery, "blackouts vs. seizures," history of abnormal EEG's, and was assigned a GAF score of 50. [AR 841].

Five days later, a progress note indicated Pukis had a series of problems including diagnoses for depression, alcohol dependency/abuse, voice and resonance disorders, elevated liver function, dysthymic disorder, seizure disorder, anxiety disorder, Hepatitis C, COPD, PTSD, heroin dependence, and asthma. [AR 834-35]. Dr. Phillips discussed with Pukis the use of the VA's home telehealth service in order to provide Pukis with continued education and disease management. [AR 838].

On March 16, 2010, Pukis was again neurologically tested after blacking out. [AR 831-32]. The findings were abnormal as a few sharp waves on the temporal areas were indicative of a discharging focus within that region. *Id.* From April through May 2010, Pukis engaged in

telehealth communications with the VA, during which he repeatedly reported depression and chronic pain in his left arm and neck. [AR 1378-1421].

Plaintiff was then hospitalized from May 4 to May 6, 2010 after he attempted to commit suicide by hanging himself. [AR 1970-71]. The doctor spoke with Pukis's girlfriend, who admitted that Pukis drank every day and abused morphine. [AR 1977]. The doctor concluded that Pukis exaggerates his pains, and confronted Pukis regarding his alcohol and morphine use, which Pukis denied—despite having referenced the fact that he was out of his morphine prescription. *Id*. Pukis was diagnosed with alcohol dependence, history of opiate and cocaine abuse, and depression. [AR 1971-72]. No medication side effects were noted at the time of his discharge, and Pukis denied any SI. [AR 1972].

On May 18, 2010, Pukis met with a social worker, where he endorsed ongoing depression with intermittent SI and discussed being placed on the list as a high suicide risk. [AR 1372]. Pukis admitted to self-medicating by drinking to alleviate his pain. *Id*. Pukis also met with Dr. Klemme that day, stated that his neck, back, and shoulder pain was intolerable, and the doctor suggested that Pukis be admitted to the hospital. *Id*. The next day a radiology report indicated that there may be a fracture at the posterior superior aspect of the C6 vertebral body which may have been new and migrated (when compared to Pukis's previous CT cervical spine scan which was performed in March 2010). [AR 1180]. An MRI of Pukis's spine was also conducted and showed findings consistent with a C5-C6 fracture that required further evaluation. [AR 1182]. The radiology impression indicated that there was a "heterogenous marrow at C6 and C7" and that a subtle trabelar injury was not excluded. [AR 1183]. Pukis was prescribed a C-spine collar to immobilize his neck. [AR 1323].

On May 13, 2010, during a VA telehealth conference, Pukis's depression scored an 8 out of 10, and on May 19, 2010, his depression scored 9 out of 10 (with ten being the highest score). [AR 1378-79]. Pukis was again hospitalized on May 20, 2010, due to unremitting neck pain that radiated to his arms, along with bilateral paresthesias and weakness, which he was unable to treat by medications aside from morphine. [AR 1193, 1319]. When being admitted, Pukis noted that he drank heavily because nothing seemed to relieve his neck pain. [AR 1193]. He denied any current SI. [AR 1193, 1319]. During his hospital stay, Pukis displayed many depressive symptoms, and the medical specialists indicated that Pukis's suicide attempts and symptomatology pointed toward a more chronic depression, rather than only relating to pain. [AR 1195].

On May 24, 2010, Pukis reported being ready to go home because he felt great, his medications were perfect, his sleeping was good, and he felt the best he had felt in a long time. [AR 1250]. Pukis was discharged that day [AR 1193] and was given enough morphine to last him until his follow up appointment three days later. [AR 1195]. His discharge diagnoses included major depressive disorder, recurrent severe, opiate dependence, alcohol dependence, PTSD, Hepatitis C, seizure disorder, COPD, HTN, radiculopathies, chronic pain, multiple addictions, problems with his social environment [AR 1193] and cervical disc herniation. [AR 1260]. On May 25, 2010, Pukis underwent an EMG, where electrophysilogic evidence indicated chronic, left C5-6 radiculopathy. [AR 1423].

From June 2010 through September 2010, Pukis engaged in telephone calls with the VA's telehealth service regarding his ongoing pain and depression. [AR 1202-1237, 1727-1740]. On October 1, 2010, Pukis met with Dr. Phillips again and expressed that he had neck pain (tolerable with medication), a lot of anxiety, and fear of being around others due to his health

issues. [AR 1725]. He reported that his depression was still present, but he denied any SI in the past month. *Id.* Pukis also expressed interest in participating in a residential treatment program (which had been previously recommended to him). *Id.*

Pukis was then voluntarily hospitalized for a six week residential treatment program from October 7, 2010 to November 17, 2010 [AR 1428-1723]. Pukis indicated that he was admitted as a prevention measure for his depressive state and to learn how to manage [DE 1685]. During this time, Pukis was under continuous patient care for a number of problems including neck, shoulder and back pain, radiculopathies, depression, PTSD, substance abuse, seizures, Hepatitis C, and COPD. [AR 1428-1723].

About one week after being discharged from his residential treatment program, Pukis met with Dr. Phillips and expressed having bad dreams and not sleeping well. [AR 1743]. He was still depressed and felt like drinking, but had not relapsed. [AR 1856]. Pukis noted that he exercised while hospitalized, but he was now concerned with neuropathic pains he experienced after walking, which he described as burning pains in his left arm and upper chest. *Id.*

Throughout December 2010, the notes from the VA's telehealth service and several psychological evaluation progress notes indicated that Pukis continued to have high ratings for depression and he was taking significant amounts of pain medication. [AR 1842-46].

A comprehensive list of Pukis's medical issues and their active dates indicates the following: asthma and heroin dependence as of January 23, 2006; PTSD, depression, COPD, and tobacco use disorder as of March 6, 2006; Hepatitis C as of August 25, 2008; anxiety and depressive disorders as of September 17, 2008; seizure disorder as of September 19, 2008; and sedative and alcohol abuse as of February 25, 2009. [AR 554-58]. Also, Pukis was on numerous

medications throughout his treatment. [*See e.g.*, AR 559-573].  In addition, from August 2008 through March 10, 2010, Pukis's GAF score ranged from a low of 42 to a high of 50. [AR 1106].

In January of 2011, Pukis disclosed during a VA telehealth call that he lifted a tire out of the trunk of his car and hurt his back, which caused him neck pain for several weeks. [AR 89, 1838-39].  And medical records from February through March of 2011 indicate that Pukis still had the following problems: obesity, COPD, hepatitis C, seizure disorder, depressive and anxiety disorders, dysthymic disorder, polysubstance dependence, PTSD, and neck, back, arm, hand, shoulder, and neuropathic pain. [AR 1822-27]. His GAF scores ranged from 45-53[6] during those months. [AR 1824-34].

**B.      Administrative Hearing and ALJ's Decision**

On April 22, 2010, Pukis requested to be heard by an ALJ. [AR 157-58]. Pukis was afforded his hearing on April 1, 2011, when ALJ Curt Marceille heard the case in Gary, Indiana. [AR 76-119]. At the administrative hearing, the ALJ questioned Pukis extensively concerning his medical impairments and their effect on his daily activities, and about Pukis's job search given these conditions. [R 81-103].  Pukis explained that he has always had difficulties with work due to pain, but he just tried to cope and he used alcohol and pain killers to alleviate the pain. [AR 86, 95, 102].  He recounted the difficulties he had with pain in his neck, right shoulder, elbow, and knee, and noted his inability to stand and sit for long periods of time. [AR 82-83, 90, 102-03]. While he could walk to the library, it was only three blocks away and it bothered him to the point where he wanted to lay down in the grass, and if he rode his bike to get some exercise, he only went to the corner because he could not go too far. [AR 190-91, 100].  He noted that he gets disoriented and falls over and drops things due to the pinched nerves in his neck. [AR 87]. Pukis

_____
[6]A GAF score of 51-60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning.

indicated he started wearing a neck brace for his neck arthritis which cannot be treated. [AR 84-85].  Plaintiff also discussed that he has constant pain unless he takes medication, but the medication makes him feel "out there," as if he is "floating," and it causes him to have trouble remembering things. [AR 83-93]. Pukis testified that he went to a pain education clinic to find alternative ways of dealing with the pain, like using his neck brace, lying down, or kneeling down in the shower, and he was in the process of getting set up to attend a pain clinic [AR 85, 87].  Pukis also noted that he has difficulty focusing on one thing at a time and testified that he could not physically or mentally work for an eight hour workday. [AR 92, 103].  Pukis believed his seizures were controlled at this point with medication. [AR 90].

Pukis further discussed his constant depression, PTSD, pervasive suicidal thoughts, and his suicidal attempts and hospitalizations. [AR 94-99]. Pukis testified that he has had three older brothers pass away, that he has spent approximately three months in psychiatric hospitalizations during the last couple years, and that he is currently on "high risk," meaning that he is being monitored at home to make sure that his illnesses, pain, and depression are kept under control. [AR 94, 98-99]. Pukis also described that he has "good days" and "bad days." [AR 100]. During bad days, Pukis testified that he isolates himself, has no motivation to get out of bed, thinks about suicide, and feels depressed. [AR 101]. Pukis claimed that he had more bad days than good days, with about five bad days and two good days in a given week. [AR 102].

After concluding his questioning of Pukis, the ALJ then asked the VE a series of hypothetical questions.  First, the ALJ posited a hypothetical individual of Pukis's age, education, and past work experience, who was limited to light work, was unable to work with hazards, and was limited to occasional climbing, balancing, stooping, kneeling, crouching and crawling. [AR 114]. This hypothetical individual would also be limited to work that involved

only simple, routine, repetitive tasks with occasional decision-making, no contact with the public, and only occasional interaction with coworkers and supervisors in the workplace. [AR 115]. This individual could not perform fast-paced production work, but would instead focus on performing goal-oriented type work. *Id.*

Based on the first hypothetical, the VE determined that such an individual would be unable to perform Pukis's past work, but could perform unskilled light work. *Id.* In particular, the individual could work in clerical positions, including jobs such as a collator, router, folding machine operator, and mail machine operator. [AR 115-16].

The second hypothetical involved an individual with the same limitations as the first hypothetical, but imposed an added limitation that the work had to be performed at the sedentary exertional level. [AR 116]. With the second hypothetical the VE found that the individual could perform work as an addresser and document preparer. *Id.*

Defense counsel also posited a hypothetical to the VE which was identical to the ALJ's first hypothetical, but added that due to severe depression, the individual was unable to motivate himself to get dressed and go to work all five days in the week. [AR 117]. Based on this hypothetical, the VE concluded that there would be no employment for such an individual. *Id.* The attorney posed a second hypothetical where an individual was hospitalized at various times for a total of two and a half months in a two year period. *Id.* Based on this hypothetical, the VE concluded that such an individual would be prevented from work because at an unskilled level, the tolerance for absences within the first 90 days is only one to two days, and thereafter only one to two absences would be permitted in the subsequent months. *Id.*

On May 6, 2011, ALJ Marceille issued an opinion unfavorable to Pukis. [AR 57-69]. The ALJ found that Pukis met the insured status requirements of the Social Security Act through

March 31, 2013 and found that Pukis had not engaged in substantial gainful activity (SGA) since January 5, 2009, the alleged onset date. [AR 59]. The ALJ concluded that Pukis had the severe impairments of major depression; recurrent generalized anxiety disorder; polysubstance abuse; status post elbow contracture release, cubital tunnel, and carpal tunnel release; cervical spine arthritis; obesity; and a history of possible seizures. *Id.* Despite these impairments, the ALJ concluded that Pukis did not have an impairment or combination of impairments that met or medically equaled any of those included in the Listing of Impairments at 20 C.F.R. Part 404, Subpart P, Appendix 1 ("Listings"). [AR 60]. The ALJ determined that Pukis had the RFC to perform light work as defined in 20 C.F.R. §§ 404.1567(b) except he was unable to work with hazards including unprotected heights, open flames, and dangerous moving machinery; and could only occasionally climb, balance, stoop, crouch, kneel, or crawl. [AR 62]. Due to moderate restrictions in concentration, persistence or pace, he was limited to simple, routine, repetitive tasks that did not require more than occasional changes in work setting and only required occasional decision making. *Id.* Due to moderate restrictions in social functioning, Pukis was also limited to jobs involving no work with the public and only occasional interaction with coworkers and supervisors. *Id.* Given the RFC determination, the ALJ concluded Pukis could not perform his past work, but could perform jobs that existed in significant numbers in the national economy including work as a clerical collator/operator, clerical router, and clerical folding machine operator. And at the sedentary exertional level, Pukis would be able to perform work as an addresser and document preparer [AR 68-69]. Therefore, the ALJ deemed Pukis not disabled. [AR 69].

## II. STANDARD OF REVIEW

The Commissioner's final decision in this case is subject to review pursuant to 42 U.S.C. § 405(g), as amended, which provides that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It must be "more than a scintilla but may be less than a preponderance." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). It is the duty of the ALJ to weigh the evidence, resolve material conflicts, make independent findings of fact, and dispose of the case accordingly. *Perales*, 402 U.S. at 399-400. As a result, the court "may not decide the facts anew, reweigh the evidence, or substitute its own judgment for that of the Commissioner to decide whether a claimant is or is not disabled." *Butera v. Apfel*, 173 F.3d 1049, 1055 (7th Cir. 1999). Even if "reasonable minds could differ" about the disability status of the claimant, the court must affirm the Commissioner's decision as long as it is adequately supported. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008).

The ALJ is not required to address every piece of evidence or testimony presented, but he must provide a "logical bridge" between the evidence and the conclusions. *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009). Conclusions of law, unlike conclusions of fact, are not entitled to deference. If the Commissioner commits an error of law, remand is warranted without regard to the volume of evidence in support of the factual findings. *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997).

## III. DISCUSSION

Disability benefits are available only to those individuals who can establish disability under the terms of the Social Security Act. *Estok v. Apfel*, 152 F.3d 636, 638 (7th Cir. 1998).

Specifically, the claimant must be unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Social Security regulations create a five-step sequential evaluation process to be used in determining whether the claimant has established a disability. 20 C.F.R. § 404.1520(a)(4)(i)-(v). The five step process asks:

1. Whether the claimant is currently engaged in substantial gainful activity;

2. Whether the claimant has a medically severe impairment;

3. Whether the claimant's impairment meets or equals one listed in the regulations;

4. Whether the claimant can still perform relevant past work; and

5. Whether the claimant can perform other work in the community.

*Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). If the claimant is performing SGA (step one) the claimant will be found not disabled. 20 C.F.R. § 404.1520(a)(4)(i). If the claimant does not have a severe medically determinable impairment or a combination of impairments that is severe and meets the duration requirement (step two), then the claimant will likewise be found not disabled. 20 C.F.R. § 404.1520(a)(4)(ii). If the claimant is not performing SGA and does have a medically severe impairment, however, the process proceeds to step three. At step three, if the ALJ determines that the claimant's impairment or combination of impairments meets or equals an impairment listed in the regulations, disability is acknowledged by the Commissioner. 20 C.F.R. § 404.1520(a)(4)(iii). In the alternative, if a Listing is not met or equaled, then in between steps three and four the ALJ must assess the claimant's RFC, which, in turn, is used to determine whether the claimant can perform his past work (step four) and whether the claimant can perform other work in society (step five). 20 C.F.R. § 404.1520(e). The claimant has the

initial burden of proof in steps one through four, while the burden shifts to the Commissioner in step five to show that there are a significant number of jobs in the national economy that the claimant is capable of performing. *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004).

Pukis alleges that the ALJ committed 4 primary errors: (1) the ALJ did not reasonably support his step three Listing finding as to medical equivalence because he ignored several of the claimant's impairments and did not obtain an expert opinion to determine medical equivalence (2) the ALJ's RFC determination was not supported by substantial evidence because he failed to properly consider all of Pukis's physical and mental limitations; (3) the ALJ's credibility determination was not adequately supported; and (4) because the RFC and credibility findings were erroneous, the step five hypothetical vocational profile given to the VE did not include all of the relevant limitations, which then resulted in an improper finding that Pukis could perform a significant number of jobs.

## A.     Findings as to Medical Equivalence

Pukis first challenges the ALJ's cursory finding at Step 3 indicating that Pukis did not have a physical impairment that met or equaled a listed impairment.

A claimant is eligible for benefits if he has an impairment, or combination of impairments, which meets or equals an impairment found in the Listing of Impairments. 20 C.F.R. § 404.1520(d); 20 C.F.R. Pt. 404, Subpt. P, App. 1. The Listing describes impairments that are considered presumptively disabling when a claimant's impairments meet the specific criteria described in the Listing. 20 C.F.R. § 404.1525(a). A claimant may also demonstrate presumptive disability by showing that his impairments are accompanied by findings that are equal in severity to those described in a section of the Listing. 20 C.F.R. § 404.1526. To meet or

equal a listed impairment, the claimant must satisfy all of the criteria of the listed impairment.

*Maggard v. Apfel*, 167 F.3d 376, 379-80 (7th Cir. 1999) (citations omitted).

The ALJ's three-sentence discussion of this question relative to Pukis's physical limitations said only the following:

> Based on a comparison of *the objective medical evidence* and the requirements of *the applicable listings*, I find that the claimant does not have a physical impairment that meets or equals one of the listed impairments. In reaching this finding, I have considered all of the claimant's impairments, both individual and in combination. I note that the claimant's representative did not argue at the hearing nor in his pre-hearing "summary" (Ex. 25E), nor are there any opinions from treating sources in the medical evidence of record, that the claimant either meets or equals a listing.

[AR 60] (emphasis added). Pukis argues that these three sentences do not adequately explain the reasoning behind the ALJ's decision. Pukis has not argued that he qualified for a specific listed disability, however, he cites to various medical records indicating the ALJ should have considered Pukis's documented cervical spine impairments (in addition to cervical spine arthritis), COPD, and shortness of breath.

While it is true that Pukis has the burden of showing that his impairments meet a Listing, *Maggard*, 167 F.3d at 380, the Seventh Circuit has also held that an ALJ should mention the specific listings he is considering and his failure to do so, if combined with a "perfunctory analysis," may require a remand. *Ribaudo v. Barnhart*, 458 F.3d 580, 583 (7th Cir. 2006) (citing *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004); *Brindisi ex rel. Brindisi v. Barnhart*, 315 F.3d 783, 786 (7th Cir. 2003); *Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002)). In this case, as in *Barnett*, not only did the ALJ not mention or identify any "applicable" Listing concerning physical impairments, but the ALJ did not evaluate *any* evidence favorable to Pukis despite his extensive medical history and documented ongoing physical problems. The ALJ also

26

did not discuss the required criteria of any particular Listing with respect to Pukis's physical problems, despite the ALJ's finding that Pukis suffered from several severe physical impairments, including cervical spine arthritis, obesity, and status post elbow contracture release, cubital tunnel and carpal tunnel release. Not only did the ALJ fail to explicitly refer to any Listing or its criteria, he then performed only a perfunctory analysis—or no analysis at all—of Pukis's physical limitations. As a result, the ALJ failed to minimally articulate his justification for rejecting or accepting specific evidence of a disability, thereby requiring remand. *Berger v. Astrue*, 516 F.3d 539, 545 (7th Cir. 2008) ("An ALJ must only 'minimally articulate his or her justification for rejecting or accepting specific evidence of a disability.'") (citation omitted).

Pukis also asserts that the ALJ performed an improper medical equivalence analysis because the ALJ provided no expert opinion as to medical equivalence. The government relies on the opinions of Dr. Siddiqui and Dr. Sands who completed Disability Determination Transmittal Forms regarding Pukis's physical impairments and the opinions of Dr. Unversaw and Dr. Larsen who offered medical opinions regarding Pukis's mental impairments—all of which indicated that Pukis's impairments did not meet any Listing. Specifically, on March 30, 2010, Dr. Sands affirmed the assessment performed by Dr. Siddiqui on December 29, 2009, and on March 17, 2010, Dr. Larsen affirmed the psychiatric assessment performed by Dr. Unversaw on December 1, 2009.

The government is correct that disability forms completed by state agency physicians can conclusively establish that a physician designated by the agency has given consideration to the question of medical equivalence, and the ALJ may properly rely upon the opinion of these medical experts. *Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004) (citations omitted). However, SSR 96-6p requires an ALJ to obtain an updated medical expert opinion prior to

27

making a decision of medical equivalence "[w]hen additional medical evidence is received that in the opinion of the administrate law judge or the Appeals Counsel *may* change the State agency medical or psychological consultant's finding that the impairment(s) is not equivalent in severity to any impairment in the Listing of Impairments." (emphasis added). And in Pukis's case, the state agent medical opinions are substantively incomplete because they were offered prior to the revelation of significant additional medical records supporting further impairment. *See Staggs v. Astrue,* 781 F.Supp.2d 790, 794-96 (S.D. Ind. 2011) (finding that the medical record omitted from review provided "significant substantive evidence" regarding the claimant's medical impairments and that any medical opinion rendered without taking this subsequent record into consideration was "incomplete and ineffective.").

For instance, after the state agent medical opinions were affirmed in March 2010 by Drs. Sands and Larsen, Pukis (1) had an additional x-ray which indicated further cervical spine impairments and radiculopathy, and he was prescribed a neck brace [AR 1180-83, 1323; 1423]; (2) was hospitalized for two days in early May 2010 after attempted suicide by hanging [AR 1971]; (3) was hospitalized later in May 2010 for five days due to neck pains that radiated to the arms and bilateral paresthesias and weakness [AR 1193] at which time it was noted that Pukis's suicide attempts and symptomatology pointed toward a more chronic depression, rather than relating only to pain; (4) called the VA's telehealth services from June throughout September 2010 to seek assistance with his ongoing pain and depression; and (5) was hospitalized on October 7, 2010 for six weeks in a residential treatment program for depression and opiate dependence [AR 1193-96]. In addition, Pukis again engaged in repeated telephone calls with the VA's telehealth service, in December 2010, with reports of ongoing pain, depression, and anxiety.

Despite the fact that the state agents' opinions were rendered without these medical records, which clearly reflect ongoing and increased problems with Pukis's mental and physical limitations, the ALJ relied heavily on those opinions without indicating whether the additional medical evidence was such that it might have changed the state agents' findings relative to medical equivalence. Although the ALJ did note his own consideration of Pukis's hospitalizations, he did so only with respect to deciding whether Pukis had experienced episodes of decompensation and to determine whether Pukis was legitimately suicidal. Ultimately, the additional records may have resulted in a change relative to the finding of medical equivalence with respect to Pukis's physical and mental impairments, and an updated medical expert opinion should have been sought, in accordance with SSR 96-6p. Accordingly, this case must be remanded to the Commissioner with instructions to obtain and consider an updated medical opinion regarding whether, based on all of the evidence in the record, Pukis's severe impairments, singly or in combination, medically or functionally equal any of the Listings of Impairments.

**B.      RFC Determination (and Credibility Finding) with Respect to Pukis's Limitations**

Pukis next argues that the ALJ erred by not properly considering his testimony and all of Pukis's physical and mental limitations when forming the RFC [DE 16 at 14-18].

The RFC is an assessment of the work-related activities a claimant is able to perform on a regular and continued basis despite the limitations imposed by an impairment or combination of impairments. *Carradine v. Barnhart*, 360 F.3d 751, 780 n. 27 (7th Cir. 2004). This finding must be based upon all of the relevant evidence in the record. 20 C.F.R. § 404.1545(a). The ALJ must consider all medically determinable impairments, even if not considered "severe," 20 C.F.R. § 404.1545(a)(2), and the RFC determination must be supported by substantial evidence. *Arnett v.*

*Astrue*, 676 F.3d 586, 591 (7th Cir. 2012). The ALJ's decision regarding a claimant's RFC is a legal decision, rather than a medical one. 20 C.F.R. §§ 404.1546(c), 404.1527(e).

In Pukis's case, the ALJ determined that Pukis was capable of performing light work, was unable to work with hazards, could only occasionally climb, balance, stoop, crouch, kneel, or crawl, could only perform simple, routine, repetitive tasks that did not require more than occasional changes in work setting and decision making, and could not work with the public, but could interact occasionally with coworkers and supervisors. Light work as defined by the regulations requires lifting up to 20 pounds, frequent lifting of objects weighing up to 10 pounds, and "a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. § 404.1567(b). In fact, "the full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday." SSR 83–10.

The Court realizes that an ALJ need not discuss every piece of evidence in the record in rendering his decision, so long as he builds a logical bridge from the evidence to his conclusion. *See Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010) (noting that the ALJ has an obligation to consider all relevant evidence and cannot "cherry-pick" facts that support a finding of non-disability while ignoring evidence that points to a disability finding). However, in this case, the ALJ has not bridged the gap between the evidence and his RFC determination, rather, he engaged in the type of cherry picking *Denton* prohibits.

The ALJ's opinion is replete with his reliance only on the facts supporting his ultimate finding that Pukis could perform work at the designated RFC level, without considering evidence undermining his conclusion. For instance, relative to Pukis's exertional limitations, the ALJ noted that although Pukis had a right elbow release and was obese, he was released back to work

with no restrictions in January 2008 and continued to work for an entire year until January 2009; his November 2009 physical consultative exam indicated normal muscle strength in his upper and lower extremities, as well as normal grip strength and gait; he broke his girlfriend's nose in February 2010; and he lifted a tire out of his trunk in January 2011.  Similarly, when considering whether any additional postural limitations were necessary in the RFC, the ALJ summarily stated, without further detail, that he had taken into consideration Pukis' cervical spine arthritis and disc space narrowing  noted in May 2010.  The ALJ then noted that despite Pukis's cervical spine osteoarthritis and despite Pukis's complaints of disabling symptoms, Pukis had "remained relatively active"—he went "door to door" looking for work, he rode a motorcycle and a bicycle, he played pool and Wii bowling, he completed Sudoku puzzles, and he completed a fitness regimen while in in-patient treatment.

But, the ALJ never specifically identified any of the records supporting Pukis's claim that he suffers from further exertional, postural, and manipulative limitations than those identified in the RFC.  For instance, in August 2008, Pukis attributed his difficulty falling asleep in part due to his elbow pain; in September 2008, it was noted that Pukis continued to experience stress from his chronic pain in his right shoulder, elbow, and wrist, as well as hypertension, COPD, Hepatitis C, and a history of two head injuries; in October 2008, an X-ray of Pukis's right elbow displayed diffuse significant osteoarthritis with small suture anchors on the medial distal humeras; also in October 2008, an orthopedic surgeon determined that Pukis was taking a variety of narcotics for his right elbow pain and stiffness; in February 2009, it was noted that he had chronic pain in his right arm; in April 2009, it was noted that Pukis was taking a lot of ibuprofen for his chronic pain; in July 2009, it was noted that he had mild arthritic changes in his spine at C7; in October 2009, the doctor opined that Pukis had chronic pain in his right shoulder, elbow, and wrist, and

that Pukis was self-medicating, and later that month Pukis was hospitalized and reported pain in his right shoulder; in December 2009, Pukis reported that his arm continued to cause him severe pain; in February 2010, a radiology report of Pukis's cervical spine reveled osteoarthritis in his lower cervical spine and a narrowing of the cervical disc spaces, and an X-ray of Pukis's right shoulder displayed the presence of two metallic tuck points overlying the proximal humerus, and osteoarthritis in his right elbow with soft tissue calcifications at the anterior aspect of the elbow; in March 2010, it was reported that Pukis's shoulders hurt him constantly, causing him sharp intense pain, but that he was able to ride his bicycle and get some exercise; from April through May 2010, Pukis engaged in telehealth communications with the VA, during which he repeatedly reported depression and chronic pain in his left arm and neck; in May 2010, additional lower cervical spine problems were noted, including a C5-C6 fracture and radiculopathy, and Pukis admitted to self-medicating to alleviate his pain; later in May 2010, Pukis was hospitalized due to unremitting neck pain that radiated to his arms, along with bilateral paresthesias and weakness; and throughout December 2010, Pukis continued to complain of pain and was taking significant amounts of pain medication.

In essence, despite the voluminous amount of medical records evidencing Pukis's ongoing physical problems, the ALJ never identified these records or explained why, despite these records, he felt Pukis was still capable of performing work at the given RFC without any additional exertional limitations. *Roddy v. Astrue*, 705 F.3d 631, 636 (7th Cir. 2013) ("An ALJ must consider all medical opinions in the record . . . [and] [a]lthough the ALJ was not required to address in writing every piece of evidence or testimony presented, he was required to provide 'an accurate and logical bridge' between the evidence and his conclusions.") (citing *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008); *McKinzey v. Astrue*, 641 F.3d 884, 891 (7th Cir. 2011)).   The

ALJ did give "significant weight" to the state agent opinions of Drs. Siddiqui and Sands relative to Pukis's physical limitations, but the ALJ did so without providing any explanation for how the actual treating doctors' records and opinions were accounted for in his RFC assessment. Thus, no such "logical bridge" appears in this ALJ's opinion.

Also problematic is the fact that the ALJ failed to acknowledge that Pukis continually sought medical treatment for his pain, which according to Pukis (in addition to his other problems), limited his ability to work full time on a consistent basis. The ALJ discounted Pukis's statements with respect to the intensity, persistence, and limitations caused by his pain and other symptoms. However, the ALJ's assessment of Pukis's testimony (made as part of the ALJ's RFC determination) is most suspect because the Court is uncertain how any credibility assessment could have adequately been made without consideration of whether Pukis's statements were substantiated by the significant objective medical evidence recited above— which is replete with reports of chronic pain and treatment for the same, but yet went unmentioned by the ALJ. *See* 20 C.F.R. § 404.1529(a). Further error was caused by the fact that the ALJ supported his credibility finding and RFC assessment with Pukis's ability to engage in sporadic active behavior, i.e. riding a bicycle or motorcycle, playing pool, completing puzzles, and bowling. In this sense the ALJ improperly equated the performance of these sporadic activities with the ability to perform a full day of work on a regular and consistent basis. *Carradine v. Barnhart,* 360 F.3d 751, 755-56 (7th Cir. 2004) (noting that the ALJ failed to consider the difference between a person's being able to engage in sporadic physical activities [in Carradine's case, the ability to walk 2 miles] and the claimant's being able to work eight hours a day five consecutive days of the week) (citations omitted). Here, Pukis testified to having good days and bad days. When he had good days he was able to engage in some physical

33

activities, like riding a bike, walking, and completing logic puzzles, but on his bad days he did not want to get out of bed, isolated himself, thought about suicide, and felt depressed.  It appeared that Pukis's bad days occurred more often than not.  Yet, in his RFC finding, the ALJ did not provide a discussion of the limitations that were caused by Pukis's pain, other than to say that at the time of the hearing his pain was semi-controlled. In essence, in assessing Pukis's credibility, the ALJ ignored the vast amount of medical records documenting Pukis's chronic pain and the effect it had on him. *Jelinek v. Astrue*, 662 F.3d 805, 812 (7th Cir. 2011) ("An ALJ may consider a claimant's daily activities when assessing credibility, but ALJs must explain perceived inconsistencies between a claimant's activities and the medical evidence."). As a result, the Court is unable to uphold the ALJ's RFC and credibility finding due to inadequate record support.

The shortcomings relative to the RFC determination don't stop there, and the Court briefly notes additional issues that should be handled on remand.  Despite medical evidence indicating that Pukis has been diagnosed with and suffers from COPD, shortness of breath, and PTSD, the ALJ did not evaluate how these conditions affected his RFC.  Although the government defends this aspect of the ALJ's opinion because the ALJ generally relied on the opinions of the state agency reviewing physicians, this is insufficient where the ALJ never even mentioned how Pukis's COPD, shortness of breath, and PTSD affected (or didn't affect) Pukis's ability to perform work.  The ALJ is not free to dismiss evidence of further impairment without explaining why he reached that conclusion in a manner sufficient to permit an informed review. *See Herron v. Shalala*, 19 F.3d 329, 334 (7th Cir. 1994) (admitting that the objective medical evidence relevant to the claimant's hand impairment was "very sparse" but it was supported by the medical evidence and needed to be explained by the ALJ) (citations omitted).

Finally, the ALJ erred by failing to provide a sufficient explanation for why Pukis's severe impairments of major depression and recurrent generalized anxiety disorder did not require further nonexertional limitations in the RFC. On the one hand, the ALJ did provide a detailed explanation for why he did not find Pukis to be at risk of committing suicide—mainly because Pukis experienced these suicidal episodes (typically resulting in his hospitalization) when he was abusing drugs and not properly administering his medication. But on the other hand, the ALJ never explained how limiting Pukis to only simple, routine, repetitive tasks with no more than occasional changes in work setting and decision making, no work with the public, and only occasional interaction with coworkers and supervisors was sufficient to account for his well-documented depression and anxiety.

The ALJ made the blanket assertion that he had "considered" Pukis's depression and anxiety disorders, but again, the ALJ never identified the contents of the voluminous medical records indicating that Pukis was suffering from and sought treatment for these mental issues on an ongoing basis. Nor did the ALJ explain how his RFC determination was supported by Pukis's mental health records. Although the ALJ did rely heavily on the state agent opinions of Drs. Unversaw and Larsen relative to their determination of Pukis's mental capacity, as previously discussed, these opinions were rendered without the benefit of any medical records post-dating March 2010. *See* SSR 96-6p ("the opinions of State agency medical and psychological consultants and other program physicians and psychologists can be given weight only insofar as they are supported by evidence in the case record, considering such factors as the supportability of the opinion in the evidence including any evidence received at the administrative law judge and Appeals Council levels that was not before the State agency, the consistency of the opinion with the record as a whole, including other medical opinions, and any explanation for the opinion

provided by the State agency medical or psychological consultant or other program physician or psychologist"). Again, Pukis's post-March 2010 medical records provided substantive evidence regarding his medical impairments, and any medical opinion rendered without taking this subsequent record evidence into consideration is incomplete, ineffective, and simply not supported by substantial evidence. *Id.*; *see* 20 C.F.R. § 404.1520(e) (stating that the claimant's RFC is to be based on "all the relevant medical and other evidence in [the claimant's] case record.").

Furthermore, the ALJ did not explain why the omission of these subsequent medical records from the state agents' review made no difference in the RFC assessment. Such an explanation would have been especially important in this case, where Dr. Unversaw opined in December 2009 that during periods of sustained sobriety, Pukis's condition significantly improved and his underlying depression and anxiety were fairly well controlled. But the medical records show that even after October 2010—the date upon which the ALJ believed Pukis had become substance free—Pukis was hospitalized for a six week treatment program for his depressive state, and thereafter he continued to suffer from high level ratings for depression and anxiety into March 2011. Therefore, in assessing Pukis's RFC on remand, the ALJ must consider whether Pukis could sustain a full-time work schedule despite the problems caused by the totality of his impairments, including but not limited to his depression and anxiety. *See* SSR 96-8p. Should the ALJ ultimately determine that Pukis is disabled, then given the medical evidence of his drug and alcohol addiction, the ALJ must then determine whether the drug and alcohol addiction are contributing factors material to the determination of disability. 20 C.F.R. § 404.1535.

**C.      Hypotheticals Posed to the VE**

The ALJ found that given the RFC determination, Pukis could not perform his past work (step four), but he could perform jobs that existed in significant numbers in the national economy (step five).  Pukis contends that the ALJ's failure to adequately consider all of his limitations in the RFC and hypothetical questions posed to the VE resulted in unreliable VE testimony.[7]

The Court agrees with Pukis.  Without a proper credibility determination and RFC evaluation, steps four and five cannot be properly analyzed. *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004) (the ALJ must determine the claimant's RFC before performing steps 4 and 5 because a flawed RFC typically skews questions posed to the VE); 20 C.F.R. §§ 404.1520, 404.1545; SSR 96-8p.  In other words, the Court has no way of concluding whether the hypothetical questions posed to the VE ultimately included all of Pukis's limitations because there was an insufficient discussion of the record evidence supporting the ALJ's RFC determination.  Moreover, to the extent some of the more restrictive hypos posed by defense counsel may have included all of the limitations from which Pukis suffers, the VE responded that Pukis would not have been able to sustain competitive employment.  In essence, given the unsupported RFC determination, it is impossible for the Court to determine whether the questions posed to the VE were adequate and inclusive of all the conditions Pukis alleges he suffers from, and whether the VE's testimony sufficiently established whether Pukis could in fact

---

[7]The transcript testimony contained a few "inaudibles" at the point where the hypothetical questions were posed to the VE, and it appears that the ALJ limited the hypotheticals to a person who could only perform simple routine repetitive work with only occasional changes in the work setting.  This problem should be rectified should another hearing take place and a transcript produced.

perform other work.[8]  *See Jelinek v. Astrue*, 662 F.3d 805, 813 (7th Cir. 2011) (noting that ALJ's must provide vocational experts with a "complete picture of a claimant's residual functional capacity.").

## IV.    CONCLUSION

For the aforementioned reasons, the Commissioner's decision is **REVERSED** and **REMANDED** for further proceedings consistent with the conclusions in this order.

SO ORDERED.

ENTERED:  February 3, 2014

_____/s/ JON E. DEGUILIO_____
Judge
United States District Court

---

[8]Admittedly, the Seventh Circuit has occasionally assumed a VE's familiarity with the claimant's limitations, despite any gaps in the hypothetical, when the record shows that the VE independently reviewed the medical record or heard testimony directly addressing those limitations. *O'Connor-Spinner v. Astrue*, 627 F.3d 614, n. 5 (7th Cir. 2010) (citing *Simila v. Astrue*, 573 F.3d 503, 521 (7th Cir. 2009); *Young*, 362 F.3d at 1003; *Steele v. Barnhart*, 290 F.3d 936, 942 (7th Cir. 2002); *Ragsdale v. Shalala*, 53 F.3d 816, 819-21 (7th Cir. 1995); *Ehrhart v. Sec'y of Health & Human Servs.*, 969 F.2d 534, 540 (7th Cir. 1992)).  This exception does not apply here, since the ALJ asked a series of increasingly restrictive hypotheticals that focused the VE's attention on the limitations of the hypothetical person, rather than on the record itself or the limitations of the claimant himself. *Id.* (citing *Simila*, 573 F.3d at 521; *Young*, 362 F.3d at 1003).